# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


VICKI L. GLASCO,                        )
                                        )
          Plaintiff,                    )
                                        )
vs.                                     )No. CIV-13-130-C
                                        )
ADVANCED DENTAL IMPLANT & DENTURE       )
CENTER, LLC, d/b/a MY DENTIST;          )
ADVANCED DENTAL IMPLANT AND             )
DENTURE, INC., and MY DENTIST           )
HOLDINGS, LLC,                          )
                                        )
          Defendants.                   )



DEPOSITION OF VICKI LYNN GLASCO

TAKEN ON BEHALF OF THE DEFENDANTS

IN OKLAHOMA CITY, OKLAHOMA

ON NOVEMBER 19, 2013



REPORTED BY:  KAREN B. JOHNSON, CSR

Vicki Glasco                                        November 19, 2013

Page 42

1       A    No.

2       Q    What did you counter with?

3       A    Seventy-five.

4       Q    Okay.  Was that accepted?

5       A    Yes.

6       Q    So you started as director of HR at My

7   Dentist at 75,000?

8       A    HR manager, yes.

9       Q    Okay.  Do you recall the day that you

10  started?

11      A    I believe it was the 26th or 7th of

12  September.

13      Q    How long after you accepted the position

14  was it that you started?

15      A    Sorry, I started September 26th or 7th, I

16  gave a month notice, so it would have been the end

17  of August when I accepted.

18      Q    You gave notice to your employer; correct?

19      A    Yes.

20      Q    Now, prior to the time that you started

21  your employment, was Kevin telling you that a

22  priority was recruitment?

23      A    One of many.

24      Q    Priority was retention of staff?

25      A    One of many.  We met, we had a -- we met

Page 43

1    several times during that month that I had gave

2    notice and it was always over benefits, not

3    staffing, nor retention.

4          Q    What do you mean by "over benefits"?

5          A    Where we were going with benefits, that

6    was one of his first priorities to me, and that's

7    why we had several meetings to talk about benefits.

8          Q    Tell me what was discussed.

9          A    That we wanted to try, one, changing the

10   provider, so we scheduled a conference call with a

11   new provider, he was asking me to kind of tap into

12   some of my previous carriers that -- that I had

13   used, so I brought him some information on the

14   carriers that I had used and we just compared.  And,

15   again, one of those visits was a conference call

16   with one of those carriers.  Just seeing, again,

17   different offers, you know, so we could try to find

18   richer benefits.

19         Q    And this was before you formally started

20   on the 26th of September?

21         A    Yes.

22         Q    So prior to the 26th of September, you

23   were having communications with Kevin about issues

24   that you needed to tackle on -- at the time that you

25   started your employment?

Page 46

1      Q      Do you recall having discussions with

2  Kevin around the first part of September about these

3  items?

4      A      I recall receiving the e-mail, yes.

5      Q      One of the things that he wanted you to do

6  was do an employee handbook review; is that correct?

7      A      Yes.

8      Q      And prior to your starting on September

9  26, 2011, were you provided the employee handbook?

10      A      Yes.

11      Q      Did you start reviewing that employee

12  handbook?

13      A      Yes.

14      Q      Let me show you -- actually, I think

15  it's -- it's there in your stack there, if you'll

16  turn to the top of that stack.

17      A      The handbook?

18      Q      Correct.  I believe right there at the top

19  is the employee handbook.

20      A      Yes.

21      Q      What's the Bates number on the first page

22  there?

23      A      002.

24      Q      Okay.  So if we look at the employee

25  handbook, the employee handbook has a policy at Page

Vicki Glasco                                    November 19, 2013

1      2 for a moment.  Exhibit Number 1 is your responses

2      to interrogatories; correct?

3            A    Yes.

4            Q    So let's turn to Page 14.

5            A    Fourteen?

6            Q    Correct.  And we'll use this as a guide,

7      but let's just walk through this.  So tell me the

8      first thing that happened that you can recall that

9      you thought was inappropriate at My Dentist.

10           A    First thing that happened was after

11     orientation on my first day, I was called into the

12     office with Kevin and Dr. Steffen, I was asked not

13     to continue the orientation that afternoon, but meet

14     with them.  In that meeting, Dr. Steffen talked

15     about staffing and one of his comments were, how

16     would you feel if I told you I need to replace ten

17     managers, and I remember saying, I would ask you

18     what type of training had they had.  He said good

19     question.  And then as an example, he said, I don't

20     want too many blacks or Mexicans at the Casady

21     location.  And Kevin agreed, and he said,

22     Dr. Steffen said, for instance, you wouldn't hire

23     black -- a black person at -- in Beverly Hills and

24     you wouldn't hire a white person in Compton.  And I

25     said, why wouldn't I?  So that was my first right

Vicki Glasco                                          November 19, 2013

Page 49

1   off the bat concern.

2          And he -- and Dr. Steffen went on to say

3   that that was -- two years later, if I remember his

4   exact terms were it was -- it was like they're --

5   example, they're for the higher clientele in that

6   area of town, so they wanted it to be more of the

7   model location.

8      Q    When Dr. Steffen made this comment, I

9   mean, you told me that you said, why wouldn't I, I

10  would hire the best qualified, what else did you

11  say?

12     A    I -- at that point, again, I just listened

13  to Dr. Steffen, I just was kind of -- I looked at

14  him with I'm sure a blank look and I said, why would

15  I not hire them and, again, we went back then to the

16  managers and I said, I would not terminate a manager

17  unless I made sure that they had had qualified

18  training and had we counseled anyone.  The handbook

19  said that we did progressive discipline, so did we

20  do that.

21     Q    Now, in this first meeting, did you tell

22  Dr. Steffen this -- this point about the handbook

23  has progressive discipline?

24     A    Yes.

25     Q    Did you use those words?

Vicki Glasco                                    November 19, 2013

Page 52

1    people that worked at the Casady location; correct?

2         A    I don't know.  I do not recall -- on my

3    visits at the Casady location, I do not recall

4    seeing anyone, but I cannot confirm that.

5         Q    There were black people that worked in the

6    administrative offices; correct?

7         A    Billing office, yes.

8         Q    Okay.  Other -- other departments;

9    correct?

10        A    Yes.

11        Q    Not just billing; correct?

12        A    Yes.  I forgot about Susan and Patricia,

13   so, yes.

14        Q    Okay.  There was Susan Porter; right?

15        A    Uh-huh.

16        Q    Yes?

17             MS. TIMBERLAKE:  You need to say yes.

18             THE WITNESS:  Yes.

19        Q    (By Mr. Wood)  Patricia Coleman; correct?

20        A    Yes.

21        Q    Then there was some African Americans

22   working in the billing department; correct?

23        A    Yes.

24        Q    Then if we look at Page 14, which I think

25   is in front of you, you say that, "On plaintiff's

Page 53

1    second day of employment, Kevin Offel was showing

2    the plaintiff the staffing analysis report, which

3    was used to track the current employees at each My

4    Dentist clinic," do you see that?

5          A    Yes.

6          Q    Then you're relating there that he is

7    telling you to put upgrade next to various

8    employees' names and that he's saying that he wanted

9    the employee gone and HR should start recruiting a

10   replacement, do you see that?

11         A    Yes.

12         Q    Now, was he pointing to one particular

13   employee or more than one employee?

14         A    More than one.

15         Q    Do you recall who it was?

16         A    No, it was my first day or second day.

17         Q    Do you recall the race of the employee

18   that he was pointing to?

19         A    No, it did not distinguish race.

20         Q    Do you recall the gender of the employees'

21   names that he was pointing to?

22         A    Just obvious by their name, whether it was

23   female.

24         Q    Well, do you recall?

25         A    Yes.

Vicki Glasco                                    November 19, 2013

Page 56

1   say, what about progressive counseling, what's the

2   process; correct?

3       A    Well, as he's quickly running through page

4   by page by page, so let's -- let's say there's 15

5   names, he might randomly in that list say, okay,

6   upgrade by Jennifer, upgrade by Debbie, upgrade by

7   Bobby, and as we went through several of these, I'm

8   typing it in, as we went through several pages, I

9   finally said, what do you mean by upgrade, and he

10  said, I want them replaced.  And that's when I said,

11  so have these people been counseled, because we talk

12  about progressive counseling, because I'm a big -- I

13  personally am a big component of that, and he said,

14  no, I need them replaced.

15          And I even said, gosh, I hope I'm always

16  notified before you put a upgrade by my name, I do

17  remember saying that.

18      Q    Under the employee handbook, do you have

19  to use progressive discipline?

20      A    It says that we do.

21      Q    Okay.  It also says that you can terminate

22  without going through discipline -- progressive

23  discipline, doesn't it?

24      A    Well, I mean, I know it's a law that they

25  can terminate without.

Vicki Glasco                                    November 19, 2013

Page 57

1      Q      Okay.  And you know that in this employee
2   handbook, it gives the employer the right to
3   terminate without going through progressive
4   discipline; correct?
5      A      Yes.
6      Q      It's not mandatory under this employee
7   handbook, is it?
8      A      No.
9      Q      Is that right?
10     A      Yes.
11     Q      What else did you and Kevin discuss when
12  he's standing there with you at the computer screen?
13     A      On -- he wanted me, I don't recall if it
14  was that day or the next day, he came in, I want to
15  say it was even the next day maybe, because he came
16  in with a different version of that report, he used
17  a for physicians only or dentists only, and asked me
18  to create basically the same staffing analysis that
19  we just looked at in a different format like he used
20  for dentists, and that was the next time we had
21  talked.
22     Q      I'm a little lost.  He -- he comes in with
23  a -- with another report that he's printed out on
24  paper; is that right?
25     A      Correct.

Page 62

1        A       He kind of just thought it was
2    unnecessary, I mean, just shook his head, kind of
3    was -- oh, his comment was, you HR people.  He would
4    say that to me often.  He goes, oh, you HR people.
5    And I asked him if I could create that and put it on
6    the intranet so it was available for managers, so he
7    said he would look at it.  And that was on his way,
8    it was late in the evening.
9        Q       What else did you and Dr. Steffen talk
10   about on that particular day?
11       A       I don't recall anything else that night.
12   We had many late night discussions.
13       Q       Moving on to the next event that you
14   thought was inappropriate, what was the next event,
15   in looking at your discovery response here, you
16   start talking about Marian Columbus told you that
17   she used the -- the blink test?
18       A       Uh-huh.
19       Q       When did that occur?
20       A       It was probably several weeks into
21   interviewing, I was trying to get more and more
22   involved in the interviewing process.  This one
23   particular lady came in that I interviewed and what
24   even prompted it was after the interview, I stepped
25   out and I told Marian I thought she was a good

1       candidate, because at this point I was supposed to

2       go through -- Marian had like the final say-so on

3       who was hired, and so I stepped out, I was -- she

4       was in the hallway there, and I was right in my

5       doorway, I said, hey, I -- I think this lady would

6       be really good for that position, and she said, you

7       take way too long in an interview, I said, why do

8       you say that, she said, because you should know we

9       have a blink test, I said, what's a blink test, she

10      said, you should know if they fit the part.  And I

11      said, you know, if I had done that, I would have

12      never recommended this woman, because it was after

13      spending time with this woman did I find her skills,

14      knowledge and abilities to be perfect for what we

15      need.

16           Q    I think you're saying in your discovery

17      responses that this was a candidate for a front desk

18      position in the Oklahoma City area, do you see that?

19           A    Yes, front desk, yes.

20           Q    I want to understand the process.  You

21      were doing a initial screening interview of a

22      candidate for a position in the Oklahoma City area;

23      is that correct?

24           A    Regarding this situation?

25           Q    Correct.

Vicki Glasco                                    November 19, 2013

Page 64

1      A     Yes.

2      Q     Okay.  Then if you felt like this person

3   needed to be interviewed further, who would -- who

4   would do the next interview?

5      A     Marian.

6      Q     Okay.  Would the regional manager at the

7   Oklahoma City area do an interview of this person?

8      A     Possible.

9      Q     At that time --

10     A     If Marian was not available.

11     Q     In fall of 2011, the regional manager was

12  Susan Porter?

13     A     Yes, for Oklahoma City.

14     Q     Right.

15     A     Yes.

16     Q     Okay.  Now, this particular person that

17  you interviewed, was this person hired?

18     A     No.

19     Q     Why not?

20     A     Marian didn't like her.

21     Q     Did Marian interview this person?

22     A     No, she said she did not look the part.

23     Q     That's the phrase she used, "did not look

24  the part"?

25     A     Yes.  And she was a middle-age lady.

Vicki Glasco                                          November 19, 2013

Page 65

1       Q     She was?

2       A     Yes.

3       Q     Okay.  Did Marian say anything else about

4    this person's appearance?

5       A     No, just walked away.

6       Q     Marian did not make a comment on her age;

7    correct?

8       A     Correct.

9       Q     Marian did not make a comment on her race;

10    correct?

11       A     Correct.

12       Q     This was a Caucasian?

13       A     Yes.

14       Q     Marian did not say on this particular day

15    that they should be cute; correct?

16       A     Said she didn't fit the part.

17       Q     Okay.

18       A     However, the reason Susan didn't always

19    interview, per Kevin, is that if Marian wasn't

20    available, then let Susan, but if Marian's

21    available, let her because Susan and Patricia hire

22    too many of their own kind.

23       Q     Okay.  We'll get to that.

24       A     Okay.

25       Q     On this particular day, though, when

Page 66

1    Marian said to you, you took too long in the

2    interview, she doesn't fit the part, what did you

3    say in response?

4         A    Which I just said, I said, Marian, I said,

5    if I had only spent the first five minutes, I

6    wouldn't have recommended her.  I got to spend time

7    and understand her skills and knowledge and

8    abilities and she is qualified for this job.

9         Q    What else did you say?

10        A    That she should spend time and interview

11   her and Marian just walked on down the hallway.

12        Q    Okay.  Was that the conclusion of that

13   discussion?

14        A    Yes, yes, Marian walked off.

15        Q    Now, I want to be sure we're going through

16   the sequence, because I think we -- maybe we stepped

17   ahead in time, but prior to that point in time, was

18   there anything else that had occurred that you

19   thought was inappropriate?

20        A    Red flags would be -- and I would agree, I

21   can't remember if this was truly before or after,

22   but my other red flag was the employment

23   application.  I had updated the employment

24   application and it was approved by Dr. Steffen, and

25   so I had asked Jennifer, who was the staffing

1    coordinator, to make sure -- clearly Jennifer did

2    the bulk of the initial interviews, so I asked her

3    to make sure, because it was a hodgepodge of getting

4    applications and resume's when I started.

5            Q    Let -- may I clarify one point?

6            A    Yes.

7            Q    Jennifer -- she was interviewing staff?

8            A    Yes.

9            Q    But was she interviewing dentists?

10           A    No.

11           Q    Who was interviewing dentists?

12           A    Marian or Kevin.

13           Q    Okay.  Go ahead.

14           A    And so I created the application, I gave

15   it to Dr. -- even Kevin, Dr. Steffen and Kevin, they

16   all approved it, so, you know, the process then that

17   I gave the ladies in the office was to make sure

18   that employees or applicants complete that prior to

19   their interview.  Several reasons, I wanted, you

20   know, a full description of their duties, one that

21   they have verified, authorized me to do background

22   checks for them and references.  Okay.

23           So we're clicking along, I think

24   everything's fine, I put that in place, probably in

25   place -- I used the application all the time, again,

Page 68

1    it gave much more detail than I needed than just a

2    resume'.  And then all of a sudden I stop finding

3    applications and Jennifer said that Marian told her

4    to stop having them filled out.

5              So I was like, why -- why, first of all,

6    was Marian telling you that, and what was her

7    reason, and she said, her reasoning was that it

8    slowed down the process, the interviewing process,

9    that if the applicant fit the part and we were

10   interested, we would have them fill out the

11   application after the fact, which I found to be

12   inconsistent, we were not getting the applications

13   on all these people that they were interested in

14   after we interviewed them.  It was like they would

15   send them to another location to interview and I

16   never got the application.

17        Q    Okay.  Let me stop you there.  I want to

18   understand the process.  So for -- for prior to the

19   time that you started using this revised employment

20   application, people that were interested in a job at

21   My Dentist would -- would come to My Dentist how?

22        A    Walk through the door.  I mean, we would

23   call and schedule the interview and they would come

24   to the corporate location.

25        Q    Okay.  How would they contact My Dentist

Vicki Glasco                                    November 19, 2013

Page 70

1      A    I -- I felt like that was a red flag of
2  why we would not want to ensure we were obtaining
3  all that information prior.
4      Q    Are you contending that it's somehow
5  illegal?
6      A    Not illegal.
7      Q    You don't have to have an employment
8  application, do you?
9      A    No.
10     Q    Is that right?
11     A    Yes.  But I also have -- should not be
12  calling and verifying someone's references if they
13  haven't authorized me to do so, to call that past
14  employer or even the current employer.
15     Q    So you have this conversation with
16  Jennifer Roberts, and so did you go to Marian and
17  talk to her about this issue?
18     A    Marian wasn't in the office that day,
19  but -- and I honestly, because she traveled, I -- I
20  could not tell you whether it was the next day or
21  several days, but when she did come back into the
22  office, I did talk to her about it.  I even asked if
23  we could have an off-site meeting because I felt
24  like there was some -- some issues, you know,
25  communication issues that we needed to clarify, why

Page 71

1   she wouldn't have talked to me first as the

2   department manager versus just walking in and giving

3   Jennifer direction to do so.

4       Q      And what was her response?

5       A      Was that she did not have time, she was

6   busy, we never met.

7       Q      And this occurred when?

8       A      Probably end of October, middle October.

9       Q      I'm just noticing that on Page 16, about

10  two-thirds down, you have a reference that this

11  might have occurred late November or early December

12  2011.

13      A      Okay.

14      Q      Is that correct?

15      A      Yes.

16      Q      So sitting here today, do you think that

17  that conversation about the job application issue

18  occurred in late November or early December 2011?

19      A      I -- yes.  I'm speculating on exact times,

20  I just know the incident that happened.

21      Q      Okay.  Let's go through the -- the

22  sequence here that you have listed in your discovery

23  responses.  So going to the top of Page 16, you have

24  a reference that, "Offel and Columbus would write

25  comments, many derogatory, eg, stupid or too much

Vicki Glasco                                      November 19, 2013

Page 72

1      plastic surgery on the candidate's

2      resume'/application," do you see that?

3           A     Yes.

4           Q     When did you see those comments?

5           A     On -- you're asking me dates, timelines?

6           Q     Correct.

7           A     I remember seeing more of those during the

8      Texas, Lewisville interviews, so that would have

9      been November, first part of November, mid November.

10          Q     Had you seen derogatory comments on

11     applications prior to that time?

12          A     No, because we were not coordinating our

13     work.

14          Q     How many applicants, excuse me, how many

15     applications or resume's did you see that had

16     derogatory comments written on them?

17          A     I would probably say ten.

18          Q     Explain the process to me, so it sounds

19     like somebody has -- has interviewed these people

20     before you see their paperwork?

21          A     Yes.

22          Q     Okay.  And then you would see the

23     paperwork?

24          A     Yes.

25          Q     For what -- for what reason?

Vicki Glasco                                    November 19, 2013

                                                        Page 73

1        A    Again, when I answer this, like I said, it

2   was a moving target, so how I answer it one week

3   could have changed the next week, okay.  But I could

4   have either seen that after Jennifer interviewed, if

5   Marian wasn't available, again, I was trying to draw

6   myself in, book me, schedule me for more of these

7   interviews, I want to get more involved, instead of

8   Marian doing those, I'm completely capable of doing

9   these interviewing -- the interviewing process.  So

10  I may see them after Jennifer interviewed or after

11  Marian interviewed, sometimes even after Kevin would

12  have interviewed, but I always got them if they were

13  hired.

14       Q    Of these ten or so resume's or

15  applications that you saw with derogatory comments

16  on them, how many of those people were hired?

17       A    One, and that one only came about two

18  months later after Dr. Steffen told Marian to hire

19  her, the one that said plastic surgery, it was a

20  Lewisville manager.  We initially had one manager

21  that filed, it was in her file, she filed all these

22  complaints against Marian, because I filed it in her

23  file, her name was Kimberly Rivers, and so they

24  let -- she walked -- you know, I don't remember, I

25  don't remember if she walked out or if they went

1    don't speculate.

2              THE WITNESS:  Well, it seemed like it was

3    even like a B for black, it was that stupid to be

4    coding if you were going to code something, but --

5         Q    (By Mr. Wood)  Well, did -- did Jennifer

6    tell you that B meant black?

7         A    She told me what the codes meant, I do not

8    recall exactly what they were, I would be

9    speculating.  I just remember it being just too

10   obvious, but I don't recall.

11        Q    So she told you something about there's

12   like an A, a B and a C?

13        A    I -- I recall -- I -- I -- from my

14   recollection, it was a -- an alphabetical system.

15        Q    Okay.  So A would be a top candidate?

16        A    I think.

17        Q    Okay.  B would be not as good a candidate?

18        A    I think.

19        Q    C would be a lower candidate?

20        A    From my under -- from my recollection.  I

21   just said, stop, stop.

22        Q    And you're seeing these regarding

23   Lewisville applications?

24        A    That's when I was pulling the files, all

25   the resume's out of the files to look for more

Vicki Glasco                                    November 19, 2013

Page 78

1        A     I believe so, eventually.

2        Q     Tell me what you mean by that.

3        A     Because -- well, I'm going to jump ahead,

4   you want me to jump ahead?

5        Q     Go ahead.

6        A     Okay.  The reason I make that comment is

7   because initially when Patricia hired for

8   Lewisville, oblivious to me because I'm not involved

9   in that, she hired numerous African American

10  employees, again, they interviewed in Lewisville,

11  I'm in Oklahoma City, so it all started with the

12  interviewing of Lenora Tatum, I interviewed a phone

13  interview from ETS as a manager at that location.

14       Q     Okay.  We'll -- we'll get to that, sorry.

15       A     But that's how it started.

16       Q     Okay.  All right.  Now, when you saw these

17  derogatory comments on these resume's or

18  applications, did any of them refer to race?

19       A     Not specific.

20       Q     They didn't say black, Hispanic, Latino,

21  anything like that; correct?

22       A     Correct.

23       Q     The phrases that you can recall today are

24  stupid, too much plastic surgery, no go, doesn't

25  look the part, and fat; right?

Vicki Glasco                                    November 19, 2013

Page 79

1      A    Correct.

2      Q    Anything else that you can recall?

3      A    No.

4      Q    Any other derogatory comments that you saw

5   on a resume' or application?

6      A    Not that I recall to quote.

7      Q    So you say that you went to Jennifer and

8   Marian and said don't do that?

9      A    Stop.

10      Q    Okay.  And Jennifer's response was what?

11      A    That she would stop.

12      Q    And what was Marian's response?

13      A    She just kind of grinned and laughed at

14   me.

15      Q    After you --

16      A    And they were in two separate rooms.

17      Q    I'm sorry?

18      A    Because Marian was not there that day, she

19   was traveling, so Jennifer was fine and -- with

20   stopping that, and then I talked to Marian those few

21   days later, that was when I said it was a day or two

22   later.

23      Q    Let me ask you this, now, if a person

24   conducting interviews wants to rate candidates by

25   top candidate, second tier candidate, third tier

Vicki Glasco                                    November 19, 2013

Page 80

1    candidate, nothing wrong with that; correct?

2         A    Correct.

3         Q    Okay.  And that's -- that's commonly done,

4    isn't it?

5         A    Within individuals, yes, of course.

6         Q    After you told Marian Columbus and

7    Jennifer Roberts to not do that anymore, thereafter,

8    did you continue to see derogatory comments written

9    on resume's or applications?

10        A    No, but I also did not look.  I don't

11   recall, I was really ramping up for managers, I

12   trusted that they would stop.

13        Q    Okay.  So as far as you know, the process

14   of writing derogatory comments on applications or

15   resume's stopped?

16        A    Correct; as far as I know.

17        Q    Then going to the bottom of Page 16, you

18   say that you went to Marian's office and asked if

19   they could go to lunch and discuss some issues, do

20   you see that?

21        A    Yes.

22        Q    And this is what you were telling me about

23   previously?

24        A    Yes.

25        Q    And it looks like, though, that you did

Page 82

1    saying that she -- if she wanted to keep the -- the

2    cute, young ones for the office, and if they didn't

3    fit that part, and they were qualified, they could

4    go to the billing office.

5          Q    Now, this discovery response says, "If

6    they were not cute enough or they were overweight,"

7    do you see that?

8          A    Well, that was definitely one issue.

9          Q    Okay.  I see no reference to if they were

10   young.

11         A    That was understood.

12         Q    Was it stated?

13         A    It has been.

14         Q    Okay.  When Marian was talking about

15   referring applicants for poster/collectors, did she

16   say, I'm referring the ones that aren't young over

17   to the billing department?

18         A    She said fit the part.

19         Q    Okay.  Did she say if they're not cute

20   enough or if they're overweight, they don't fit the

21   part, are -- are those the words she used?

22         A    She had talked about them being

23   overweight, yes, and not fitting the part.

24         Q    Tell me the words that she used that you

25   can recall.

Vicki Glasco                                    November 19, 2013

Page 83

1        A    She said if they were overweight or didn't

2   fit the part.   And I always understood fit the part

3   from previous comments she had made about wanting

4   the young, cute girls.

5        Q    But she didn't say anything about race;

6   right?

7        A    Right.

8        Q    Anything about ethnicity; correct?

9        A    Correct.

10        Q    At the top of Page 18 you refer to that

11   you could hear Columbus laughing about it outside

12   her office in the hallway while there was another

13   candidate there to interview with Porter, but had

14   been deemed by Columbus to be too cute for billing,

15   do you see that?

16        A    Yes.

17        Q    Okay.   Do you know who you're referring

18   to?

19        A    The candidate, no, I wouldn't, I don't

20   remember the name of the candidate.

21        Q    Do you know if that candidate was hired?

22        A    The candidate was hired for the -- hang

23   on, because there was two candidates that day.

24   Tracy Porter had interviewed a lady, spent time with

25   her, was ready to go with her, claimant A, and then

Page 85

1    Tracy's frustration?

2         A    Yes.

3         Q    All right.   And you're saying that Marian

4    responded to you that's what Steffen expects me to

5    do?

6         A    Correct.

7         Q    Okay.   Have any other discussion with

8    Marian about this issue?

9         A    No.

10        Q    Did Marian say that she was making

11   decisions about where to send candidates on the

12   basis of their race?

13        A    No.

14        Q    Were all of these candidates female?

15        A    Yes.

16        Q    Were there male candidates coming in the

17   door?

18        A    On occasion, rarely.

19        Q    Okay.

20        A    And most of them were out of state, most

21   of the males seemed like that I was coordinating

22   interviews with were like in Tulsa or in the

23   Arkansas.

24        Q    But to be clear, the -- the pool of people

25   that we're talking about that were coming in the

Page 86

1    door and they are being divided up to billing versus

2    going to the clinics, we're talking about a pool of

3    people that are all female?

4         A    The majority, yes, yes.

5         Q    Okay.  Great majority?

6         A    Great majority.

7         Q    Can you -- can you think of any males?

8         A    For that particular position?

9         Q    Correct.

10        A    No.

11        Q    Then in the next paragraph you say that

12   you asked Steffen about the EEO 1 reports, do you

13   see that?

14        A    Yes.

15        Q    Did you work on an EEO 1 report?

16        A    Yes.  For -- for My Dentist?

17        Q    Correct.

18        A    No.

19        Q    You'd worked on one for prior employers?

20        A    Correct.  And I knew because of the

21   timeline I was hired that it was due, I think it's

22   October 13th was the deadline, so I was asking if

23   they needed me to get that out, if it had been done.

24        Q    Anything else about the EEO 1 report,

25   other than what you've outlined here in your

Vicki Glasco                                    November 19, 2013

Page 87

1    discovery responses?

2         A    No.

3         Q    Then moving on to the bottom of Page 18,

4    it looks like you were organizing personnel files

5    for terminated employees, do you see that?

6         A    Yes.

7         Q    You were having Lyndsay Hagedorn scan

8    them?

9         A    I was requesting to have her come in and

10   scan them.

11        Q    Was she scanning them?

12        A    She scanned for maybe four hours and was

13   told to stop.

14        Q    Was that a point of disagreement between

15   you and Dr. Steffen as to whether or not these files

16   should be scanned?

17        A    We agreed to disagree.

18        Q    You wanted them scanned and he didn't want

19   them scanned?

20        A    Thought it was a waste of time and money.

21        Q    Okay.  Employee files don't have to be

22   scanned, do they?

23        A    No.

24        Q    It's not a legal requirement; correct?

25        A    Correct.

Vicki Glasco                                           November 19, 2013

Page 88

1        Q     Now, you say there were missing and
2   incomplete I9 forms.
3        A     Yes.
4        Q     Who was responsible for completing I9
5   reports?
6        A     It would depend on the location.  If they
7   were out of town and state, the clinic manager
8   should have obtained that information prior to
9   coming to HR, if they were local, they would come to
10   an orientation at the admin and then I would obtain
11   those during orientation and all the appropriate
12   requirements.
13        Q     So the incomplete I9 reports were reports
14   coming from other locations?
15        A     All over, yes.
16        Q     But for the local area, you felt like I9
17   reports were complete and -- and proper?
18        A     Not when I got there.
19        Q     Okay.  But once you got there, were they
20   being filled out correctly?
21        A     I was working on it.  I would tell you if
22   they came to orientation and I was in the
23   orientation, I obtained everything that was
24   required.
25        Q     Then on Page 19 you were talking about the

Vicki Glasco                                    November 19, 2013

1    interview with Lenora Tatum, do you see that?

2         A    Yes, sir.

3         Q    Did you participate in the Skype interview

4    that Mr. Offel had with Lenora Tatum?

5         A    No, I did not.

6         Q    Do you have any personal knowledge of how

7    Lenora Tatum did in the interview?

8         A    With Mr. Offel?

9         Q    Correct.

10        A    No.

11        Q    Do you have any personal knowledge of how

12   she appeared?

13        A    No.

14        Q    Then at the top of Page 20, you say that

15   you asked Kevin about the interview with Ms. Tatum,

16   do you see that?

17        A    Yes.

18        Q    And you say that he said, "She has those

19   really long gross fingernails and we have enough

20   black people in Lewisville," do you see that?

21        A    Yes.

22        Q    Did he say anything else?

23        A    No, he walked off, it was done in the

24   hallway.

25        Q    Okay.  Do you know when this interview

Vicki Glasco                                        November 19, 2013

Page 90

1    occurred?

2         A    There's -- there's reference to it in the

3    e-mails, it was late November or even maybe

4    December.

5         Q    By the time that the interview with Lenora

6    Tatum occurred, do you know the racial makeup of the

7    Lewisville office?

8         A    I don't, other than the statement

9    Dr. Steffen made to me right after Kevin's response

10   to me.

11        Q    And his statement was what?

12        A    Was that when I went to Dr. Steffen about

13   his comment on Ms. Tatum, he shut me down and said,

14   Vicki, you've already been given an answer, matter

15   of fact, there's too many black people there already

16   and they're all ugly, so based on that comment, I

17   would guess he didn't like the ratio, and Jennifer

18   was with me, I had went to Jennifer's office and

19   said, would you come with me, I need to talk to

20   Dr. Steffen.

21             Patricia -- again, I had -- I had did a

22   phone interview with Ms. Tatum, I had personally

23   checked all her references, they were the most

24   outstanding I had ever received from the CFO to the

25   accounting manager to other dentists, you know, and

Page 91

1    Kevin's e-mails had talked about, you know, this is

2    urgent, this is urgent that we get this filled, I'm

3    like she's -- she's great, she interviews with

4    Patricia, Patricia likes her, she's ready to go, and

5    then so the last step is Kevin's Skype, so then when

6    he responded to me, I went and got Jennifer, I went

7    to Dr. Steffen's office, and that's when he said,

8    you know, that I'd already been given an answer.

9         Q     Now, had you interviewed Ms. Tatum before?

10        A     On the phone.

11        Q     Was she African American?

12        A     I didn't know that, I could have assumed

13   that maybe by her voice, but I had not met her

14   personally.

15        Q     Do you know if there were anyone that

16   applied for employment at the Lewisville office that

17   was excluded from employment because of their race?

18        A     I do not at this point in time, I was

19   working on managers, not the staff.

20        Q     Do you know of any managers that were

21   excluded from employment because of their race?

22        A     No.

23        Q     Now, the -- on Page 20, at the end of that

24   first full paragraph, you say that, "One of the male

25   trainers was asked to assist," do you see that?

Page 93

1    response?

2         A    I thought it was.

3         Q    Can -- can you point that out to me?

4         A    It's in a lot of my other records.  That's

5    why I was kind of jumping around, because I was like

6    this -- I'm not sure if this was all flowing

7    together.

8         Q    We'll be going through some other

9    discovery responses, if --

10        A    Okay.

11        Q    If you see it, if you'll point that out to

12   me.

13        A    Okay.

14        Q    Okay.  Then moving on, on Page 20 you

15   start talking about that there's an event toward the

16   end of 2011, that you found out that there was a

17   major job fair going on in early 2012 in Texas to

18   help recruit dentists, do you see that?

19        A    Yes.

20        Q    Now, you, yourself, had no responsibility

21   for recruiting dentists; is that correct?

22        A    Correct.

23        Q    That was Marian's job; right?

24        A    Correct.

25        Q    Not Vicki Glasco's job; correct?

Vicki Glasco                                    November 19, 2013

Page 94

1       A       Correct.

2       Q       Had you been told before this that My

3   Dentist was not a fan of job fairs?

4       A       Oh, I vaguely remember talking about some

5   job fairs like up in Tulsa and stuff.  I would say,

6   yes, I don't think they were a huge fan of them.

7       Q       Had you been told prior to this point in

8   time by Kevin Offel that he thought job fairs were a

9   waste of time?

10       A       I think so.  But this was an annual job

11   fair that they went to every year.

12       Q       Do you know if they went to this job fair?

13       A       They did.

14       Q       By that I mean, did My Dentist send

15   representatives to this job fair?

16       A       They did, yes.  And they sent Jennifer

17   with Marian.

18       Q       Now, you say that you went to Marian's

19   office and asked about the job fair and who would be

20   involved, do you see that?

21       A       Yes.

22       Q       Okay.  And asked if you would be attending

23   as HR manager, do you see that?

24       A       Yes.

25       Q       Now, prior to this time, you had not been

Vicki Glasco                                     November 19, 2013

1          A      At times.

2          Q      Now, you say at the top of the Page 21

3     that you believe this was part of an ongoing attempt

4     to push you out of your role as HR manager, do you

5     see that?

6          A      Yes.

7          Q      Why did -- why did you think that?

8          A      Again, as the HR manager, I -- she had

9     already planned to take Jennifer, yet Jennifer was

10    my employee and I knew nothing about this.  I had

11    e-mails from marketing requesting immediate needs

12    for the job fair, so she asked me why I didn't give

13    them more notice, I mean, that's not in here, but I

14    think her -- anyway, so it was the marketing

15    director, and I said, I have no idea, I just learned

16    about this, so clearly, I would have given you a

17    heads up, if I had known.

18              Again, I felt like it was -- if you're

19    taking an employee in my department, you would have

20    came and talked to me first, that this is what I

21    need, this is what we're planning, coordinate it, so

22    I -- if I'm not going, then I -- I know to even be

23    covering for Jennifer's position.  There was just no

24    communication at all.  Again, I only found it by

25    seeing the copy of a job fair on the copy machine.

Vicki Glasco                                    November 19, 2013

Page 102

1       Q    So if I understand what happened, you did

2   complete the Form 2; correct?

3       A    Yes.

4       Q    You did complete an incident report?

5       A    Yes.

6       Q    Now, did you complete the Form 2 or did

7   somebody else complete the Form 2?

8       A    I did.

9       Q    Okay.  Did you complete the incident

10  report?

11      A    Yes.

12      Q    What role did Ashley Watts have in the

13  preparation of the Form 2?

14      A    Nothing at that time, she -- on

15  November -- October 7th, she was removed from my

16  supervision and was not to do anything with workers'

17  comp.  That was at a meeting.

18      Q    Do you know if Diane Boykins was provided

19  workers' compensation benefits?

20      A    I do not know what happened.

21      Q    Were you reprimanded for filling out a

22  Form 2?

23      A    I was told not to do anything for her.

24  I -- Kevin called me into his office with her

25  supervisor, with Diane's supervisor, and told me not

Vicki Glasco

November 19, 2013

Page 103

1     to do a f'ing thing, that she was just milking it,

2     but I did go back and complete everything I knew I

3     was -- I should be doing and was responsible to do.

4          Q     Okay.  And so, thereafter, did Kevin come

5     to you and say I'm going to punish you for doing so?

6          A     I don't know that he even knew I did it.

7          Q     So you were not punished for doing so?

8          A     No.

9          Q     By anyone; correct?

10         A     I didn't hear you.

11         Q     By anyone; correct?

12         A     Correct.

13         Q     Then I think you were telling me at some

14    point in time that Dr. Steffen made the comment that

15    Patricia Coleman and Susan Porter were hiring too

16    many blacks; is that correct?

17         A     Yes.

18         Q     Do you recall when that conversation

19    occurred?

20         A     It was probably in October when we were

21    gearing up on staffing, because that's when he

22    wanted Marian to have the last interview, and if she

23    wasn't available, then he would let them have the

24    last interview.

25         Q     So this statement was made in a meeting

Vicki Glasco                                    November 19, 2013

Page 104

1   with Dr. Steffen?

2           A      Yes, he was in my room talking to me.

3           Q      Okay.   So my understanding is that you're

4   contending that Dr. Steffen said that Patricia

5   Coleman and Susan Porter are hiring too many blacks

6   and did not make good hiring decisions; is that

7   correct?

8           A      That is correct.

9           Q      And in response to his statement, what did

10  you say?

11          A      I said, well, then why doesn't Todd

12  McKnight, who is our male regional manager, and we

13  had another very young, Adrien, regional manager,

14  not have to have a second interview.   And he said,

15  because I just answered you, Vicki, and that was it.

16          Q      Did you have any other conversations with

17  Dr. Steffen about that particular issue?

18          A      No.   He told me -- it -- and that was when

19  he had told me that Marian would start being over me

20  regarding staffing.   So it was -- I wished I knew

21  the date, but it was mid to late October probably.

22          Q      Did he explain to you why he wanted Marian

23  to supervise issues related to staffing?

24          A      No, he did not.

25          Q      You state that in your complaint, that

Page 105

1   "Plaintiff had been advised by others in the company

2   that she had better watch Columbus because Columbus

3   was protected and could get people fired," do you

4   recall that?

5        A    Yes.

6        Q    Were you told that?

7        A    Yes.

8        Q    Who told you that?

9        A    Ashley told me that and Jennifer told me

10   that, they told me that on multiple occasions.

11        Q    Then you say in your complaint, this is

12   Paragraph 26, "Plaintiff ignored these warnings and

13   disregarded directives from Columbus that were

14   illegal."  What directives did Columbus give you

15   that you thought were illegal?

16        A    Like hiring based on what somebody looked

17   like.  Her telling me to use the blink test and

18   basically kind of getting on to me that day that I

19   took too long in an interview.  Making comments,

20   again, just based on what the person looked like.

21        Q    Marian never told you to hire someone

22   based upon their race, did she?

23        A    No.

24        Q    Is that correct?

25        A    Correct.  Just not too hire, again, too

Vicki Glasco                                    November 19, 2013

Page 106

1    many of one ethnicity at the Casady location.

2         Q    Who told you that?

3         A    That was also said by Marian.

4         Q    Then you say, Paragraph 37 of your

5    complaint that, "A few days before plaintiff was

6    wrongfully terminated, she was asked to inform the

7    dental hygienists by memo that they must clock out

8    if leaving before completing their eight hours of

9    work on any given day."  Who asked you to prepare

10   that memo?

11        A    Dr. Steffen and Kevin.

12        Q    Did they explain to you what their concern

13   was?

14        A    That they needed to verify their hours.

15        Q    In Paragraph 39 of your complaint you say

16   that, "During this process, plaintiff had been

17   informed that the hygienists were being required to

18   clock out if they left early, but were not allowed

19   to report more than eight hours worked even when

20   they worked more than eight hours in a day," do you

21   recall that --

22        A    Yes.

23        Q    -- allegation?

24        A    Yes.

25        Q    Who told you that?

Vicki Glasco                                    November 19, 2013

Page 107

1       A      The hygiene director, Jenny Head.

2       Q      What did she tell you?

3       A      She told me that I -- she told me that it

4   wasn't necessarily clocking in and out, they -- when

5   the hygienists came in, they were to log eight

6   hours, and if they worked over that, they were not

7   paid, but if they worked under that, they had to

8   change their hours to identify what time they left.

9   They weren't paid if they came in early in the

10  morning for meetings, they weren't paid during

11  lunchtime meetings and they weren't paid if they

12  worked over eight.  So I said, okay, I need to

13  follow up with Dr. Steffen and Kevin.

14      Q      Let's go to Exhibit 2, which is our stack

15  of e-mails.  Let's turn to Bates 311 to 315.  So it

16  looks like that -- and I'm looking at Bates 311,

17  that on or about December 28, 2011, you were told

18  that prepare a draft regarding dental hygienists?

19      A      Yes.

20      Q      Okay.  And looking at the bottom of Bates

21  311, you see a e-mail from Pat Steffen to yourself

22  saying, "Please do a policy letter to get hygienists

23  to start clocking in and out to come from you and

24  Kevin.  Steffen," do you see that?

25      A      Yes.

Page 108

1      Q     Okay.  Did you have any verbal

2   communication with Dr. Steffen about this issue?

3      A     No, I created the draft.

4      Q     Did Kevin or Dr. Steffen explain to you

5   what -- what the issue that they wanted addressed?

6      A     No.

7      Q     Now, if we look at Bates 315, is this a

8   copy of the memo that you prepared on this issue?

9      A     Correct.

10      Q     Then if we look at 314, there's an e-mail

11   from yourself to Pat Steffen and you copy Kevin

12   Offel and Jenae Pitts, and Jenae is J-E-N-A-E, do

13   you see that?

14      A     Yes.

15      Q     You say, "I have added the additional text

16   per Kevin's request," do you recall what the

17   additional language that he wanted?

18      A     Uh-huh, he told me to add the note section

19   down there and the italicized, he had asked me to

20   add that.  And then it was after this that I talked

21   to Jenny.  So that's when I sent the e-mail, which

22   is 314.

23      Q     After you sent the e-mail, which is at

24   314, did you have any conversations with Dr. Steffen

25   or Kevin Offel about this issue?

Vicki Glasco                                    November 19, 2013

Page 109

1        A      Zero.  No response.

2        Q      Did you have any conversations with Jenny

3    Head after you sent this e-mail?

4        A      314?

5        Q      Correct.

6        A      No.

7        Q      Did you have any discussions with anybody

8    about concerns that wages weren't being paid

9    correctly?

10       A      No, because Friday we were off for the

11   holiday, and then I was fired as soon as I came

12   back, so there was really no timeline.

13       Q      What day was it that Dr. Steffen

14   terminated you?

15       A      Was it the 3rd or 4th?

16       Q      So you come to work and at some point in

17   time you're asked to come in and talk to

18   Dr. Steffen?

19       A      Correct.

20       Q      And was that first thing in the morning or

21   how did that work?

22       A      It was actually at lunchtime.

23       Q      Okay.  Tell me what happened.

24       A      He called me into his office and -- and

25   just said, have a seat, and he said, Vicki, I don't

Vicki Glasco                                        November 19, 2013

Page 110

1   think it's working, and his mannerisms, he used his

2   hands like this back and forth and said, it's just

3   the dynamics, and I said, what do you mean by

4   dynamics, he said, between Marian, Patrick and

5   Kevin.

6           Q      What did you say?

7           A      I said that -- I actually immediately

8   said, well, I feel like I am the only one looking

9   out for you, for instance, has Patrick talked to you

10  about the $100,000 plus that I've identified and he

11  was supposed to tell you for months, and he said no.

12  And then -- you want me to go into the whole

13  conversation?

14          Q      Please.

15          A      Okay.  So I continued to tell him all of

16  my findings in the benefits, and he said, no, he had

17  not been informed of that.  And he said, you know,

18  Vicki, I may really be making a big mistake, and I

19  said, I think you are, I said, I'm not sure why you

20  even hired me as an HR manager here because you do

21  not let me do my job.  And he said that the board of

22  directors, that they had investors now, because he

23  agreed, he was like, you know, I'm not going to hire

24  someone else, and he said that the board of

25  directors and the investors had requested that they

Vicki Glasco                                    November 19, 2013

Page 111

1    include an HR manager, and that he was not going to
2    hire another one.  And that he would give me a good
3    reference and I told him, you know, that I thought a
4    lot of him and hated that it happened that way, I
5    was upset and crying and I -- Marian met me in my
6    office and I took my things.
7         Q    You're saying that you had identified
8    $100,000, what are you talking about?
9         A    In excess.  One of the first things when
10   Lyndsay came on board is because we were continually
11   getting phone calls where people didn't have their
12   benefits, so we started doing -- again, before open
13   enrollment, we started doing an audit and found as
14   we -- as it continued, there was over $100,000 in
15   premiums that we were still paying on employees that
16   had been terminated from the company.
17        Q    And did you explain that to Dr. Steffen
18   when you met with him on the 2nd or the 3rd?
19        A    Yes.
20        Q    Whatever day it was that you were
21   terminated.
22        A    The day I was terminated, yes.
23        Q    Okay.  What else did you and Dr. Steffen
24   talk about?
25        A    That's about it, short and sweet.

Vicki Glasco                                    November 19, 2013

Page 112

1            (Defendant's Exhibit Number 6 marked for

2            identification and made part of the

3            record)

4       Q    (By Mr. Wood)   Okay.   Let me show you what

5  I marked as Exhibit 6.   Exhibit 6 is a letter of

6  reference that Dr. Steffen provided to you; correct?

7       A    Correct.

8       Q    And you did receive this; correct?

9       A    I did.

10       Q    Do you know if Dr. Steffen badmouthed you

11  to anyone after you left your employment?

12       A    No.

13       Q    Do you know if anyone with My Dentist

14  badmouthed you after you left your employment?

15       A    I am not aware of that, no.

16       Q    Let's go through some e-mails.   Again, if

17  you'll pull our stack here, which is Exhibit 2.

18  Let's go to Bates Number 48.   Exhibit 48 is an

19  e-mail dated September 20th, 2011, and at the bottom

20  it -- it starts out with a e-mail from yourself to

21  Kevin, do you see that?

22       A    Yes.

23       Q    Okay.   And it says, "I look forward to

24  reviewing orientation and training processes with

25  you both," do you see that?

Vicki Glasco                                    November 19, 2013

Page 113

1          A    Yes.

2          Q    Then you say, "Do you currently have a

3     checklist which details company processes and

4     policies covered in orientation and training," do

5     you see that?

6          A    Yes.

7          Q    And Kevin's response is, "Heck, no, that's

8     why we need an HRM to take us to the next level," do

9     you see that?

10         A    Yes.

11         Q    At this point, did you understand that it

12    was a priority to Kevin Offel for you to standardize

13    hiring processes?

14         A    Yes.

15         Q    Let's go to Page 63.  If we look at the

16    top of that page, Page 63, it's an e-mail to --

17    excuse me, from Kevin to yourself dated September

18    28, 2011, do you see that?

19         A    2008?  I mean September 2008?

20         Q    September 28, 2011.

21         A    Yes.

22         Q    Okay.  And he's emphasizing to you that he

23    wants you to have a firm understanding of the entire

24    staffing situation, do you see that?

25         A    Yes.

Vicki Glasco                                    November 19, 2013

Page  124

1          A     It was on November 7th, that morning when

2    I came back to work after this.

3          Q     You say everything changed?

4          A     With Kevin, communication.

5          Q     Okay.  You were -- you were sensing

6    hostility from Kevin by early November?

7          A     After November, after this, so not prior

8    to.

9          Q     Okay.  But by November 7th, 2011, you were

10   sensing hostility from Kevin?

11         A     Frustration, I don't know that you'd call

12   it hostile, but definitely frustration.

13         Q     By November 7, 2011, what frustration,

14   other than what we've already talked about, had

15   Kevin expressed to you?

16         A     I just felt like he wrote me off.

17         Q     Why do you think that?

18         A     I don't know if he took -- I don't know if

19   he took that as a challenge, I don't know, I

20   challenged him, I don't know.

21         Q     Took what as a challenge?

22         A     When I answered back, I mean, that was the

23   only communication, he's always talking about things

24   changing quickly, so I responded, things do change

25   quickly because, you know, I wasn't going to

Page 129

1   started, I received a phone call from our workers'
2   comp carrier of six outstanding claims, that's when
3   I had Ashley start helping me in workers' comp to,
4   one, obtain incident reports because there was
5   nothing, I couldn't find anything, so that was my
6   first concern, clearly not having a -- a -- any kind
7   of safety policy, in orientation we did no safety
8   training.
9           But on October 7th, there was a hygienist
10  that had received a needle stick, I was told that
11  the -- the patient had HIV, now, I'm not sure how
12  they knew that, that's just what I was told by the
13  manager.  But the hygienist herself called me that
14  evening, it was after 5:00, again, so I had been
15  there a week, that may have been my first week, and
16  she was very distraught.  I, again, looked for any
17  kind of policies on what to do to help her.  I
18  really kind of went into my mode of where I came
19  from with the physicians and asked her to contact an
20  urgent care office, nobody was available, nobody --
21  everybody was gone at -- at our location, so she
22  proceeded to do so.
23          I was still at work when she called me
24  back, I think her name was Lauren, there's e-mails
25  related to it.  And she called me back after she

Page 130

1    left the doctor's office, they -- the prescription

2    they were going to give her was going to cost like

3    $700, so I was mortified, so I called Kevin to let

4    him know what was going on about the needle stick,

5    about the cost, and he said to the effect like are

6    you really bothering me about this shit.  And I -- I

7    am so used to working so closely and directly with

8    my CEO before, I was just like, yes, I thought you

9    would really want to know this.  To me this was

10   extremely important.  And, anyway, so basically it

11   was like, okay, well, I'm putting you on notice, you

12   know, that this is what happened.

13           Monday, there's follow up from the manager

14   to me, that employee was going to be back on

15   Tuesday, you know, because I had followed up to see

16   how she was doing.  And that Dr. Steffen had called

17   me into his office and told me he had heard about

18   all this and to -- you know, this stuff is going to

19   happen, it's always happened, do not waste my time

20   on it, and just kind of pushed it under the rug.

21           Diane Boykins --

22     Q     Okay.  Now, before we leave that -- that

23   event, in that recitation, what are you saying is a

24   illegal employment practice?

25     A     To tell me not to care for that employee,

Page 131

1    to not, one, even do an incident report, to not,

2    two, even get her medical attention.

3         Q    And what are you saying was your

4    opposition to an illegal employment practice?

5         A    I am not sure that I really know what

6    that -- what you mean by that question.  I'm

7    opposing that --

8         Q    Well, you were saying that you were

9    terminated for your opposition to illegal employment

10   practices, so you told me about an event in October

11   of 2011, so I'm saying, okay, what was your

12   opposition to an alleged illegal employment

13   practice?

14        A    Because each time I tried to do the right

15   thing, legally, what's required of me under OSHA

16   standards with just the general duty clause, I'm

17   told that's just a bunch of HR crap and I don't need

18   to do that.

19        Q    Okay.  Then you were going to move on

20   to --

21        A    Diane Boykins --

22        Q    -- Diane Boykins.

23        A    Diane is African American, she came in and

24   honestly, this Lauren, I don't know, she was in Ada,

25   I believe, I don't know anything about, but Diane

Vicki Glasco                                    November 19, 2013

Page 133

1    2, and I called the carrier to let them know I was

2    sending her for -- to the doctor's office.

3         Q    And what would you say was your opposition

4    to an illegal employment practice?

5         A    Him telling me not to do anything for her.

6         Q    What actions did you take that you believe

7    were opposition to an illegal employment practice?

8         A    That I followed through.

9         Q    Okay.  Now, if I'm understanding your

10   lawsuit, you're saying that you were terminated for

11   providing assistance to Diane Boykins; is that

12   correct?

13        A    One of.

14        Q    One of the reasons, okay.  And why do you

15   believe that?

16        A    Because it was going against what Kevin

17   told me to do.

18        Q    Okay.  Did anyone ever tell you that you

19   were terminated because you assisted Diane Boykins

20   with a workers' comp claim?

21        A    No.

22        Q    What other facts do you have to support

23   your belief that you were terminated for providing

24   assistance to Diane Boykins?

25        A    Nothing.

Page 134

1      Q     What's the next event that you believe was

2   a event of your opposition to illegal employment

3   practices?

4      A     The overtime.  Identifying their overtime

5   practices of not paying non-exempt employees.

6      Q     What do you say was your actions of

7   opposition to an illegal employment practice?

8      A     Well, I didn't get any further, other than

9   to identify the Fair Standard Labor Act -- Labor Act

10  to them and what's required and what they're not

11  doing, and I even stated that, you know, I'm trying

12  to protect you, so I mean, I was fired two days

13  later, so I don't --

14     Q     Why do you say that you --

15     A     I felt like it was a combination.

16     Q     Why do you say that you were fired in

17  retaliation for opposition to an illegal failure to

18  pay wages?

19     A     Because I felt like I continued to oppose

20  most all of their activities.

21     Q     I'm -- I'm talking about the overtime

22  issue, do you believe that you were fired for

23  opposing some improper payment of overtime?

24     A     I believed it was a high coincidence that

25  I was never talked to about any kind of performance

Vicki Glasco                                          November 19, 2013

Page 135

1    of anything, and when I stated that -- there was

2    constant communication between Kevin, Steffen and

3    myself, until I stated that opposing that memo, that

4    I do not send that memo out because it's not legal

5    if we are not paying them, and then I'm fired two

6    days later, there's no communication at all after

7    that.

8         Q    Did anyone tell you that you were fired

9    for raising an issue regarding payment of overtime

10   to dental hygienists?

11        A    No, no.

12        Q    What's the next event that you say was an

13   illegal employment practice for which you were --

14        A    Nothing more --

15        Q    -- terminated for opposing that illegal

16   employment practice?

17        A    Nothing more than what we discussed with

18   the -- the -- like the meeting with Dr. Steffen that

19   apparently isn't in this petition when he referred

20   to, one, you know, how I -- how they would select

21   the blink test, not to hire the certain ethnicity at

22   the clinic, Dr. Steffen telling me there's too many

23   blacks in -- at Lewisville, to the point where he

24   picked up the phone and called someone to go help

25   assist Patricia so she would stop hiring black

1   people.  That's his quote.

2       Q    Did you oppose these practices?

3       A    Yes, I asked if I could go, can I go help

4   with the interviewing process.  I truly believed

5   that I could set a precedence on correct way to

6   interview.

7       Q    Tell me how you opposed those employment

8   practices.

9       A    In that meeting?

10      Q    Well, you're talking about the blink test,

11  references to hiring people on the basis of

12  ethnicity, too many blacks at Lewisville, and what

13  I'm trying to get at is you're saying you opposed

14  such practices?

15      A    I mean, I -- I would just be reiterating

16  what I said at the time that someone said that to

17  me.

18      Q    Okay.  And that's what I'm trying to get

19  at is tell me how you opposed each of these

20  practices.

21      A    Okay.  For instance, with Marian on the

22  blink test, again, that she should be looking at the

23  skills, knowledge and abilities a person has, has

24  nothing to do with what a person looks like, again,

25  I'm just kind of laughed off and she says that's

Page 137

1    what Dr. Steffen expects her to do.

2          Kevin, when he talked about Ms. Tatum, of

3    course, I couldn't say much to him about that

4    because he just walked off.  Other than I said, you

5    know, it's irrelevant because I said, I said, it's

6    irrelevant whether she's black and ask her to cut

7    her fingernails if he thought that was his only

8    issue was that her long fingernails.  And that's

9    when I went to Jennifer, went to Dr. Steffen to

10   oppose Kevin, that comment about not hiring her.

11   And I got nowhere because that's when Dr. Steffen

12   said, you've already heard the answer, we do have

13   too many blacks, plus they're ugly.

14          He calls Deb Reid, what he says, Vicki, he

15   said, do you -- can you -- could you go there, I

16   said, I would love to go there, I even have family

17   in Kingston, Oklahoma, so I could stay there,

18   wouldn't even cost you any hotel fees, so I was

19   anxious to be able to go to help.  And -- and he

20   calls Deb Reid, which was the trainer, and he

21   said -- he goes, I ought to -- I ought to go ahead

22   and just fire Pat's ass right now and ask Deb to

23   leave, but I don't know where she was, he -- because

24   he was on the phone, but she was traveling, if she

25   would go there and help Patricia, so I never did get

Page 138

1    to go.

2         Q    What did you say in response to all of

3    that?

4         A    Well, when he got off the phone, Jennifer

5    and I both, because I said, Dr. Steffen, I said, I

6    really truly believe that Lenora Tatum is qualified

7    for this job, and he said, we're past that.  And

8    that I would really like to go and help with the

9    interviewing process, that, again, race wasn't an

10   issue, and he just looked at his desk and kind of

11   act like he didn't even hear me and shuffled through

12   papers like that.  And that was it.  You all can be

13   excused.

14        Q    Now, we talked about the overtime issue,

15   but for all -- all of these other issues, did you

16   express to Kevin Offel or Pat Steffen or Marian

17   Columbus that you are breaking the law?

18        A    Yeah, and Dr. Steffen always referred to

19   me as -- well, even Kevin did a couple times on work

20   comp, well, even in the hallway, he used his f'ing

21   words again to me, when I was trying to get some

22   labor posters, but, yes.

23        Q    Tell me when you told My Dentist

24   management that they were breaking the law.

25        A    Each time one of those things were

Page 139

1    mentioned, that it was illegal, because that's why

2    he would say you -- you're just one of those HR

3    people.  And I said, for instance, even your labor

4    posters, Dr. Steffen, and Kevin was in the room, and

5    he said, Vicki, I don't care if Obama himself comes

6    in here, what's he going to do, slap me on the hand,

7    I am not spending money on those compliance posters.

8           Q     Okay.  So you told me about labor posters,

9    what's the next time that you told My Dentist

10   management you're breaking the law?

11          A     To Marian.

12          Q     What did you tell her?

13          A     Again, about the blink test.  That she

14   cannot be doing that, she needs to base her hiring

15   decisions on the person's skills, abilities and

16   their knowledge, you can't be doing that and you

17   can't be making all these little codes that you're

18   making on there, that's illegal.

19          Q     What other times did you tell My Dentist

20   management that they were breaking the law?

21          A     We've already got the overtime; right?

22          Q     Correct.

23          A     We've got the work comp, I think that's

24   it.  I'm feeling maxed right now.

25          Q     I'm sorry?